## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DARCY L. HALL, | : C.A. 11-605-RGA |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| MICHAEL J. ASTRUE, | : |
| Commissioner of Social Security, | : |
| | : |
| Defendant. | : |

## **MEMORANDUM OPINION**

Gary Linarducci, Esq., New Castle, Delaware; Attorney for Plaintiff Darcy L. Hall.

Charles M. Oberly, III, United States Attorney, Wilmington, Delaware; Patricia A. Stewart, Esq., Special Assistant United States Attorney, Philadelphia, Pennsylvania; Attorneys for Defendant Michael J. Astrue, Commissioner of Social Security.

August 8 , 2012
Wilmington, Delaware

ANDREWS, UNITED STATES DISTRICT JUDGE:

## INTRODUCTION

Plaintiff Darcy L. Hall appeals the denial of her application for disability insurance benefits under Title II of the Social Security Act and for supplement security income under Title XVI of the Social Security Act (collectively "DIB"). Jurisdiction exists pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

Pending before the Court are cross-motions for summary judgment filed by Hall and the Commissioner. Hall's motion for summary judgment asks the Court to remand the case to the Commissioner with instructions to award her DIB, or, in the alternative, reconsider the Commissioner's decision in light of this opinion. The Commissioner's cross-motion for summary judgment requests that the Court affirm the decision to deny benefits.

## BACKGROUND

### 1. Procedural History

Hall filed a request for disability on June 26, 2006. The alleged disability onset date was March 31, 2006. Her claim was denied both initially and upon reconsideration. An oral hearing was held November 21, 2008, before an administrative law judge ("ALJ"). The ALJ denied Hall's application for benefits. The Appeals Council declined to overturn that decision, which became the final order of the agency. Hall filed a Complaint (D.I. 1) seeking judicial review of the ALJ's decision and a motion for summary judgment seeking benefits. (D.I. 7). The Commissioner filed a cross-motion for summary judgment to confirm the ALJ's denial of benefits. (D.I. 12).

## 2. Medical Records

In her disability application, Hall alleged that she was disabled due to degenerative disc disease, arthritis, multiple sclerosis, anxiety attacks, and legal blindness in the left eye. Tr. at 168. During the administrative hearing, Hall testified that she also suffered from leg contractions, panic disorder, muscle spasms, and sleep trouble. Tr. at 36, 38, 46-47. Hall was also treated for chronic pain and depression. Tr. at 409.

Hall began regular treatment with an orthopedist, Dr. Kartik Swaminathan, in April 2006. Tr. at 307-25, 449-89, 516-605.[1] The record contains a letter from Dr. Swaminathan opining that Hall was "100% disabled secondary to her neck, back, and knee symptoms and her chronic depression. [Hall] is unable to return to her old work as a waitress as she is unable to stand for prolonged period of time, or lift greater than 20 pounds, [walk] greater than 10 minutes, sit for prolonged period of time. She has completed multiple courses of physical therapy which have failed to improve her condition. I do not anticipate any further improvement in her condition." Tr. at 409. Hall underwent an MRI that showed degenerative disc disease and mild facet hypertrophy in April 2006. Tr. at 246, 361. Hall has taken Methadone, Valium, Xanax, Zanaflex, Zoloft, Vicodin, Prozac, and Klonopin to treat her various conditions. Tr. at 40, 173, 217, 247, 251. 287, 291, 313. She has received injections for pain in her knees, elbows, back, and neck. Tr. at 291, 322, 430. She attended physical therapy to little benefit. Tr. at 38. Hall also received specialist treatment from Dr. Robert Varipapa, a neurologist, intermittently from April 2006 onward. Tr. at 247-52, 254-58, 361-75.

---

[1] Prior to her treatment with Dr. Swaminathan, Hall was treated by Dr. Asit Upadhyay, D.O., beginning in July 2005. Tr. at 299. Both doctors were members of the Delaware Back Pain and Sports Rehabilitation Centers until Dr. Upadhyay left the practice in July 2006. Tr. at 282. His notes are part of Hall's treatment record. Tr. at 280-99.

3

Hall received mental health treatment from Dr. Criselda Abad-Santos, a psychiatrist, starting in January 2007. Tr. at 376-86, 491-505. Dr. Abad-Santos saw Hall for forty-five minutes every month, offering medication management and psychotherapy. Tr. at 491. The doctor performed a mental health evaluation and diagnosed Hall with major depressive disorder, panic disorder, and agoraphobia. Tr. at 491. Dr. Abad-Santos also concluded that Hall had "marked" restrictions of daily activities, social functioning, and concentration, persistence, or pace. Tr. at 495. Further, Dr. Abad-Santos opined that Hall was unable to meet competitive standards of unskilled work. Tr. at 493.

The record contains opinions from non-treating physicians. These include a physical residual functional assessment by Dr. M. Golish, D.O. Tr. at 346-51. When instructed to conclude whether the severity of Hall's self-reported symptoms was consistent with the medical and non-medical evidence, Dr. Golish opined that it was only "partially proportionate." Tr. at 351. Dr. Golish also noted, "There are changes in the extent of disability with inconsistent cx." Tr. at 351. Dr. Bruce Simon, psychologist, further conducted a psychological evaluation of Hall. Tr. at 300-06. He opined that she "very likely" showed signs of a conversion disorder. Tr. at 303. Dr. Simon assigned Hall a Global Assessment of Functioning ("GAF") score of forty-eight and gave her a prognosis of "Guarded." Tr. at 303-04. Dr. Douglas Fugate, Ph.D., later performed a mental health residual functional capacity assessment of Hall. Tr. at 326-39. Dr. Fugate reviewed her records and diagnosed Hall with a generalized anxiety disorder, a conversion disorder, and a personality disorder, but found her to be able to "meet the basic mental demands of simple work." Tr. at 330, 331, 339.

4

### 3. Administrative Hearing

The administrative hearing was held on November 21, 2008. Tr. at 26. Hall testified about her life before the alleged disability and about her medical conditions and symptoms. Tr. at 30-55. Prior to her alleged disability, Hall was employed as a waitress. Tr. at 33. As of March 31, 2006, she was no longer able to work. Tr. at 34-35. Muscle spasms and pain were the chief ailments that prevented Hall from working. Tr. at 35-38. They left her weakened; for example, she was unable to lift a gallon of milk without difficulty. Tr. at 45. She stated that four out of seven days of the week were "bad days" during which she spent all day resting. Tr. at 52-53. Some days were so bad that she could only go to the bathroom and the refrigerator. Tr. at 53. Leaving her home gave her anxiety and panic attacks based on the fear that muscle spasms would occur in public. Tr. at 43. She had difficulty sleeping and experienced mood swings. Tr. at 42. Her physical and mental impairments left her with a very limited social life. Tr. at 48-50.

Lee Hudgins, a friend of Hall, also testified at the administrative hearing. Tr. at 56. Hudgins testified to her relationship with Hall as co-workers and her observations of Hall's muscle spasms and symptoms of pain, anxiety, and depression. Tr. at 56-60. A vocational expert next offered testimony. The ALJ presented a hypothetical to the vocational expert consistent with the ALJ's view of Hall's physical and mental limitations. Tr. at 61-64. The vocational expert opined that such a hypothetical person was capable of finding work that existed in sufficient numbers in the economy. Tr. at 64.

The ALJ rejected Hall's claim for DIB in a May 12, 2009 decision. Tr. at 9.

5

## STANDARD OF REVIEW

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., evidence offered by treating physicians)-or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

6

Thus, the inquiry is not whether the Court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the Court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision so long as that decision is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## DISCUSSION

### 1. Disability Determination Process

Title 11 of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that he or she was disabled prior to the date she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Brown,* 926 F.2d at 244 (3d Cir. 1990). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3). A claimant is disabled "only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel,* 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the

7

sequential process, the Commissioner will not review the claim further. 20 C.F.R. §
404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged
in any substantial gainful activity. If the claimant is engaged in substantial gainful activity, a
finding of non-disabled is required. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not
engaged in substantial gainful activity, step two requires the Commissioner to determine whether
the claimant is suffering from a severe impairment or a combination of impairments that is
severe. If the claimant is not suffering from a severe impairment or a combination of
impairments that is severe, a finding of non-disabled is required. *See* 20 C.F.R. §
404.1520(a)(4)(ii).

If the claimant's impairments are severe, the Commissioner, at step three, compares the
claimant's impairments to a list of impairments (the "listings") that are presumed severe enough
to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii): *Plummer,* 186 F.3d at 428.
When a claimant's impairment or its equivalent matches an impairment in the listing, the
claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment,
either singly or in combination, fails to meet or medically equal any listing, the analysis
continues to steps four and five. *See* 20 C.F.R. § 404.1520(e). At step four, the Commissioner
determines whether the claimant retains the residual functional capacity ("RFC") to perform her
past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer,* 186 F.3d at 428. A claimant's
RFC is "that which an individual is still able to do despite the limitations caused by her
impairment(s)." *Fargnoli v. Massanari,* 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the
burden of demonstrating an inability to return to her past relevant work." *Plummer,* 186 F.3d at
428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer,* 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See id.* In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

The ALJ applied the sequential analysis in rejecting Hall's claim. The ALJ found that Hall met the insured status requirement of the Social Security Act and had not been engaged in substantial gainful activity since the alleged disability onset date of March 31, 2006. Tr. at 14. Hall thus satisfied the first step of sequential analysis. At the second step, the ALJ determined that Hall suffered from multiple severe impairments, including panic disorder, major depressive disorder, back impairment associated with lower extremity spasms, and impaired left eye vision. Tr. at 15. The ALJ also determined that Hall's right knee and right elbow conditions were not severe. Tr. at 15. Because the ALJ found severe impairments existed, she continued to the third step of the sequential analysis to determine whether any impairment or combination of impairments medically equaled one of the listed impairments that statutorily presumes disability. Tr. at 15-16. The ALJ found that none of Hall's impairments equaled a listed impairment. Tr. at 15-16.

9

The ALJ then continued to the fourth step. Tr. at 16. At the fourth step, the ALJ
determined Hall's residual functional capacity. Tr. at 16. The ALJ stated that she considered all
symptoms and the extent to which they could be reasonably accepted as consistent with the
objective medical evidence. Tr. at 16. The ALJ determined that Hall retained the residual
functional capacity to perform sedentary work. Tr. at 16. The work was limited to simple,
unskilled activity that involved only low stress jobs and did not require maintaining a production
pace. Tr. at 16. At the fifth step, the ALJ determined that Hall was not capable of returning to
her previous work as a waitress, but adopted the vocational expert's opinion that Hall was
capable of working a significant number of jobs that existed in the local and national economy.
Tr. at 21-22. For these reasons, the ALJ held that Hall was not disabled within the meaning of
the Social Security Act. Tr. at 23.

**2. Appeal and Analysis of ALJ's Decision**

Hall appeals the ALJ's decision, making four arguments: (1) the ALJ erred by rejecting
the opinions of Hall's treating physicians, and instead relying on the opinions of non-treating
physicians and her own lay opinion (D.I. 8, p. 8); (2) the ALJ erred in assessing the credibility of
Hall and Hudgins and failing to consider Hall's potential somatoform disorder as a listed
impairment or an exacerbating factor (*Id.* at 19); (3) the ALJ's residual functional capacity
finding is defective because it excluded proven limitations and was based upon outdated non-
examining physician opinions (*Id.* at 22); and (4) the ALJ erred by failing to ask the vocational
expert a hypothetical question that accurately reflected Hall's limitations. (*Id.* at 23).

## A. The ALJ's treatment of Dr. Swaminathan's opinion was proper.

The Court begins by examining the ALJ's analysis of Dr. Swaminathan's opinion. The

ALJ assigned his opinion little weight in assessing Hall's residual functional capacity. Tr. at 19.

An ALJ is required to give a treating physician's opinion great weight when that opinion is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the claimant's case record." *Fargnoli*, 247

F.3d at 40. Dr. Swaminathan began treating Hall in October 2006 and was one of her treating

physicians. Tr. at 409. Dr. Swaminathan's opinion is expressed in a May 21, 2007 letter written

to help Hall obtain low-income housing. Tr. at 409. The letter stated that Hall suffered from

chronic neck and low back pain with leg and arm spasms, weakness, and arthritic pain in her

knees. Tr. at 409. He specifically diagnosed cervical facet joint syndrome, lumbar facet joint

syndrome, lumbar radiculopathy, lumbar spinal stenosis, degenerative joint disease of the knees,

depression, and chronic pain. Tr. at 409. Dr. Swaminathan noted that he prescribed Hall long-

lasting pain medication and injections. Tr. at 409. He further opined the following:

> Hall is 100% disabled secondary to her neck, back, and knee symptoms and her
> chronic depression. She is unable to return to her old work as a waitress as she is
> unable to stand for prolonged period of time, or lift greater than 20 pounds, [walk]
> greater than 10 minutes, sit for prolonged period of time. She has completed
> multiple courses of physical therapy which have failed to improve her condition.
> I do not anticipate any further improvement in her condition.

Tr. at 409.

The ALJ criticized this assessment as unsupported and contradicted by objective

evidence. An ALJ need not give the opinion of a treating physician controlling weight when it is

inconsistent with substantial evidence in the record. *See Fargnoli*, 247 F.3d at 43. Dr.

Swaminathan's opinion that Hall suffered from severe physical limitations is contradicted by the

11

opinion of Dr. Varipapa, Hall's treating neurologist. Dr. Varipapa treated Hall for muscular spasms and anxiety from May 2006 through May 2007. Tr. at 362-74, 444-46. Dr. Varipapa tested Hall's physical capabilities and she performed to his satisfaction, including tests of leg strength, cervical range of motion, sensation, reflexes, and ability to stand. Tr. at 362-63, 366, 369, 373. Further, Dr. Varipapa viewed an MRI of Halls' head and spine, judging those body parts to be normal. Tr. at 370. Significantly, Dr. Varipapa recommended exercise programs, including Pilates and yoga. Tr. at 373. This would seem to conflict with Dr. Swaminathan's conclusions that Hall was so debilitated that she could not sit or stand for more than a short period of time. Dr. Varipapa further found no evidence that she suffered from multiple sclerosis and explicitly stated that Hall "may return to work" in June 2006. Tr. at 373. He reinforced this by noting that Hall had "[n]o work restrictions given with regards to a neurologic problem" in May 2007. Tr. at 375. This contradicts Dr. Swaminathan's letter, authored that same month and opining that Hall was completely disabled. Tr. at 409.

Hall argues that Dr. Varipapa's opinion was limited to a neurological perspective and does not rebut Dr. Swaminathan's opinion because Hall no longer alleges any specific neurological problem. Hall further argues that Dr. Varipapa intended that Hall only return to part-time work, rather than full time. While it is true that Dr. Varipapa noted that "[n]o work restrictions [were] given with regards to a neurologic problem," another note affirmatively states that Hall was capable of returning to work without limitation. Tr. at 375, 373. Further, even assuming that Dr. Varipapa only believed Hall was capable of part-time work, that opinion is still contradictory to Dr. Swaminathan's conclusion that Hall was "100% disabled." Even part-time waitressing is demanding work, and it would seem to follow that an individual physically capable of waiting tables on a part-time basis could also work longer hours in a more sedentary

12

job. Hall further argues that the fact that the cause of her spasms was not identified by her doctors should not be held against her. Although the lack of an identified etiological basis does not necessarily preclude a finding of disability, it certainly is relevant to the ALJ's determination. If no objective cause of a symptom or complaint can be identified, the probability that a claimant is feigning her symptoms is increased.

Further, Dr. Swaminathan's opinion that Hall is seriously physically limited is not supported by objective evidence. Hall's MRI showed degenerative disc disease at one level, but no disc herniation or other evidence of a seriously disabling condition. Tr. at 361. Although Dr. Swaminathan's letter noted spinal stenosis, the MRI report states that "spinal stenosis or nerve canal stenosis is not suggested." Tr. at 246. Dr. Swaminathan's records state that Hall had a normal gait, moved around without much difficulty, and transferred readily. *See., e.g.*, Tr. at 284, 287, 320. These inconsistencies, along with the contradictory records provided by Dr. Varipapa, gave the ALJ a basis to discount Dr. Swaminathan's opinion. The Court may not step into the ALJ's shoes and reweigh the evidence when the ALJ had a reasonable basis to reject the a treating doctor's opinion.

## B. The ALJ failed to adequately explain why she discounted Dr. Abad-Santos' opinion.

Hall also objects to the ALJ's treatment of the opinion of Dr. Abad-Santos, Hall's treating psychiatrist. Dr. Abad-Santos filled out a "Mental Impairment Medical Source Statement" that, if credited, would indicate that Hall had severe mental impairments significantly restricting Hall's ability to work. Tr. at 491-96. The records of Dr. Abad-Santos' treatment extend from January 2007 through October 2008. Tr. at 376-86, 497-505. The ALJ did not credit the Source Statement, holding that its conclusions were "unexplained" and appeared to have

13

been based heavily on Hall's subjective complaints. Tr. at 21. The ALJ further noted that Hall was never hospitalized for mental health treatment, and the doctor's office notes indicated that Hall's condition was stable. Tr. at 21.

First, a doctor's opinion that chiefly relies on subjective complaints should not necessarily be undermined when the alleged impairment is of the type that by its very nature is self-reported; the ALJ must present a good reason to discount the credibility of the claimant. *See Morris v. Barnhart*, 78 F. App'x 820, 825 (3d Cir. 2003). Severe depression and anxiety are mental health maladies typically expressed through subjective complaints. Thus, the ALJ must provide appropriate reasons for disbelieving these subjective complaints to discount Dr. Abad-Santos' opinion. The ALJ's disbelief was based in part on treatment notes indicating that Hall was stable on her prescribed medications. Tr. at 21. A doctor's observation, however, that prescription medications have stabilized a claimant's mental condition in a non-work setting does not support the medical conclusion that the claimant is capable of employment. *See Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). Despite the notation that Hall's condition stabilized, Dr. Abad-Santos still opined that Hall's mental impairments significantly limited a number of relevant work related activities. The opinion that Hall's ability to function in the work environment is seriously limited should not be discounted because of an inference gleaned from treatment records reporting on the claimant in other environments. *Id.*

The ALJ further erred by criticizing Dr. Abad-Santos' opinion as "unexplained," despite the fact that Dr. Abad-Santos included at least some explanation beneath her entries and, more importantly, attached supporting treatment notes. Tr. at 491-96, 376-86, 497-505. For example, Dr. Abad-Santos first concluded that Hall was "unable to meet competitive standards" in regards to her ability to "understand and remember detailed instructions," "carry out detailed

14

instructions," "set realistic goals or make plans independent of others," and "deal with stressful semiskilled and skilled work." Tr. at 494. Dr. Abad-Santos accompanied these conclusions with the following: "Ms. Hall has difficulty concentrating and remembering instructions, becomes easily overwhelmed leading to acute panic attacks." Tr. at 494. Further, Dr. Abad-Santos concluded that Hall was "unable to meet competitive standards" in regards to the ability to "interact appropriately with the general public," "maintain socially appropriate behavior," "adhere to basic standards of neatness and cleanliness," "travel to unfamiliar places," and "use public transportation." Tr. at 494. The doctor then explained, "Ms. Hall becomes easily overwhelmed and stressed out when faced with problems and challenges leading to acute exacerbations of her depressive symptoms and anxiety." Tr. at 494. Dr. Abad-Santos specifically noted eight individual episodes of decompensation that occurred from March 2006 through July 2008. Tr. at 495. If these explanations constituted Dr. Abad-Santos' only attempt to justify her conclusions regarding Hall's mental limitations, then the ALJ's decision to deny the opinion weight would present a closer question. *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) (holding that "form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). Dr. Abad-Santos, however, did not merely include the fill-in-the-blank form and add commentary, but also included notes demonstrating Hall's lengthy mental health treatment. Tr. at 376-86, 497-505. These treatment notes are not encyclopedic, but they do offer some context to understand Dr. Abad-Santos' conclusions. They make the ALJ's blanket characterization of Dr. Abad-Santos' opinion as "unexplained" problematic. *See Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 662 (D. Del. 2008) (ALJ's rejection of treating physician opinion was improper when physician attached thirty pages of treatment notes to fill-in-the-blank form). If the ALJ views the treatment notes as marginal or as

15

excessively conclusory, then the ALJ should say so and explain why, but should not deny that any explanation for the opinion exists in the first place. For these reasons, the ALJ erred in her analysis of Dr. Abad-Santos' opinion. Remand is necessary for the ALJ to conduct an appropriate analysis. Because the ALJ failed to properly evaluate the opinion of Dr. Abad-Santos, it is impossible to know whether the ALJ correctly relied on non-treating physician opinions, properly assigned Hall's credibility little weight, or presented accurate hypotheticals to the vocational expert.[2] This case is remanded for consideration consistent with this Opinion.

An appropriate order will issue.

---

[2] Hall also argues that the ALJ failed to properly address her alleged somatoform disorder. Hall does not cite to any place in the record where "somatoform disorder" appears. It may be that a "conversion disorder" and a "somatoform disorder" are related, but Hall's Briefs do not demonstrate the relationship. Dr. Simon, a psychologist and state medical consultant, diagnosed Hall with a likely conversion disorder after conducting a psychological examination. Tr. at 303. The ALJ acknowledged this diagnosis, but also explained that it was made before Hall began mental health counseling. Tr. at 20. The ALJ never expressly stated how much weight she assigned Dr. Simon's opinion. Tr. at 20. Further, she did not state whether the conversion disorder met or medically equaled a listed impairment at step three of the sequential analysis. Tr. at 15-16. Upon remand, the ALJ should more directly address Dr. Simon's opinion and the alleged conversion disorder impairment.

16